[Civil No. 131.  Filed May 31, 1886.]

[S. C. 11 Pac. 119.]

THE WESTERN MINING CO., Plaintiff and Appellant, v. JAMES H. TOOLE et al., Defendants and Respondents.

1. NEGOTIABLE INSTRUMENTS—ORDER BY CORPORATE OFFICER ON DISBURSING OFFICER—NO ACCEPTANCE NECESSARY TO BIND CORPORATION—MAY BE TREATED AS EITHER NOTE OR BILL OF EXCHANGE.—Where an order for the payment of money is drawn by an officer of a corporation having authority to incur indebtedness upon a disbursing officer of the same corporation no acceptance is necessary to bind the corporation. Such an order may be treated by the holder as either a promissory note or bill of exchange.

2. SAME—GENUINENESS—PRINCIPAL AND AGENT—PRINCIPAL BOUND BY ACTS OF AGENT WITHIN SCOPE OF APPARENT AUTHORITY IMPLIED FROM COURSE OF BUSINESS DEALING—MAXIM THAT HE WHO, WITHOUT INTENTIONAL FRAUD, HAS ENABLED A PERSON TO DO AN ACT WHICH MUST BE INJURIOUS TO HIMSELF, OR TO ANOTHER INNOCENT PARTY, SHALL HIMSELF SUFFER THE INJURY, RATHER THAN THE INNOCENT PARTY WHO HAS PLACED CONFIDENCE IN HIM, APPLIED.—In a case where a bank in discounting a draft inquires concerning its validity of the bookkeeper of the corporation upon whom drawn, and the bookkeeper undertakes to say that it is genuine and will be paid when due, and it appears that such bookkeepr has in the ordinary course of business with such bank been accustomed to pass upon the validity of similar drafts, and has every opportunity to determine their validity, and in the absence of the superintendent has paid them, even though such bookkeeper has no express authority to pass upon the validity of the draft, such act is within the apparent scope of his authority as determined by his former course of dealing on behalf of his principal, and his principal will be bound. The maxim of natural justice here applies with its full force, that he who, without intentional fraud, has enabled any person to do an act which must be injurious to himself, or to another innocent party, shall himself suffer the injury, rather than the innocent party who has placed confidence in him.

REHEARING DENIED JANUARY 7, 1887.

APPEAL from a judgment of the District Court of the First Judicial District in and for the County of Cochise. Affirmed.

The facts are stated in the opinion.

Stewart & Herrin, Lewis & Dibble, and W. H. Stilwell, for Appellant.

The contract by which the drawee is made liable, whatever its form or whether verbal or written, is called an acceptance. Nothing less than what in law amounts to an acceptance, or a contract to accept, will bind the drawee or estop him from denying his obligation to pay the bill.   Bigelow on Estoppel, pages 391 to 418 inclusive.

Under the laws of this Territory no acceptance is binding unless the same is in writing.   Compiled laws of Arizona, p. 578.

Under a similar statute in New York it has been held that the drawee could in no case be held on a bill of exchange unless his acceptance was in writing.   Vol. 1, Abbott's N. Y. Digest, p. 481, sec. 154; *Luff* v. *Pope,* 5 Hill, 413; *Pike* v. *Irwin,* 1 Sanf. 14; *Duncan* v. *Berlin,* 60 N. Y. 151.

The refusal of Wade to accept the draft, in writing, when requested to do so by Mr. Clapp, the manager of the bank, dishonored the bill.   The defendants could not after such refusal become *bona fide* holders.   1 Edwards on Bills and Notes, Sec. 517; 1 Daniels on Negotiable Instruments, p. 593, Sec. 788.

O. O. Trautmer, William Herring and John Haynes, for Respondents.

PORTER, J.—Plaintiff is a corporation, and had a mine at Tombstone, and operated a mill at Contention, about 10 miles distant from its mine.   The business at the mine was transacted under the name of ''The Western Mining Company,'' and the business at the mill by the name of the ''Contention Mill & Mining Company.''   Defendants were bankers, who received the deposits of plaintiff, and paid out the same on plaintiff's orders in the ordinary course of business.   D. J. Bousfield was in charge of said mill, and transacted the business connected therewith.   On the eighth day of August, A. D. 1881, a draft or order,

purporting to be drawn by said Bousfield, in words and figures as follows:

"2,737.50.     CONTENTION MILL, August 8, 1881.

"*Contention Mill & Mining Company:* Pay to the order of Charles G. Young, two thousand, seven hundred and thirty-seven and 50-100 dollars, for 365 cords of wood, at 7½, payable September 5, 1881, and charge the same to mill account.     D. J. BOUSFIELD.

"*To J. H. White, Esqr., Supt. Contention Mine, Tombstone, A. T.*"

—Was presented to defendants at their banking-house at Tombstone, by one Howard Robinson, at that time in the employment of plaintiff, and defendants were requested by said Robinson to discount the same. It was admitted by plaintiff that said draft was in usual form of drafts drawn by the superintendent of the mill on the superintendent of the mine. J. H. White was said superintendent. Such like drafts had from time to time, in the usual course of business between plaintiff and defendant, been cashed and discounted by defendant, and ratified by plaintiff in its settlement with defendants.

At the time of the presentation of the draft said White was absent from the territory, and Mr. A. P. Wade was the book-keeper for the Contention mine. Mr. M. B. Clapp, the general manager of the bank, testified that on said eighth day of August, 1881, Mr. William B. Murray came into the bank with Mr. Robinson, and introduced him, saying, "This is Mr. Robinson, the book-keeper at the Contention mill;" that at first he declined to discount it, as he only cashed such drafts for regular customers; that afterwards Robinson returned with Mr. Wade. He said to Wade, "This draft is for an unusually large amount," and wished to know if it was all right. Wade replied: "Oh, yes; that is all right. We will pay it on the fifth. I will give you a check now, but I don't wish to run my account low. The mine may need more money, and I do not wish to be obliged to draw a draft on San Francisco." Witness further said to Mr. Wade: "Do you know that this wood is all right?" Witness said: "Do you know the payee? I think it was Young." He said: "Oh, yes; it is all right.

That is Bousfield's signature. Don't you know it? This is all right. This man is one of our employes. I would pay it now, but I am short, and if you cash it for him, make your discount as low as you can." Defendant then cashed the draft. Wade says he told the manager that the signature was Bousfield's, but could not have said it was all right. After the reception of the money, Wade and Robinson counted the money. Several days after Mr. White came into the bank; asked to see what drafts the bank had drawn, from the mill on the mine, which were shown him, and he pronounced the draft in question to be a forgery. The draft on its maturity was presented at the mine, and was not paid. Then the bank charged the amount to the account of the mine.

This action was brought for the sum of $1,641.32, for money had and received; and, by way of counter-claim, defendants set up payment of said draft, and asked for judgment for $1,096.18, over and above the sum sued for, with interest, etc., and obtained judgment for $1,250.97, principal, and interest, etc., on said judgment. The case comes here on appeal from the judgment, and from order denying plaintiff's motion for a new trial.

The first contention of plaintiff is that there was no acceptance of said draft by plaintiff. We do not deem it necessary in this character of case. We adopt the language of brief respondent: "Bousfield was in charge of the mill, and authorized to purchase fuel and other supplies for the use of the mill; and by such sale, and the purchase by Bousfield, the liability of the company was created. The office of the order was merely to inform the corporation of the indebtedness, and what it was incurred for, and to designate the person to whom it was paid. The purchase was made by the corporation through Bousfield as its agent. No liability to parties selling wood accrued against Bousfield, nor was he personally liable as the drawer of the draft or order, his agency being known." *Hicks* v. *Hinde*, 9 Barb. 528. See, also, *Mobly* v. *Clark*, 28 Barb. 390; *Hasey* v. *White Pigeon Beet Sugar Co.*, 1 Doug. (Mich.) 193. The corporation was therefor liable without acceptance.

In *Dennis* v. *Table Mt. Water Co.*, 10 Cal. 370, where the

draft was drawn by the president and secretary upon the treasurer, the court says: ''The draft is only an order of the company upon itself, from its head and secretary upon its treasurer, and it is well settled that in such cases no notice of presentation and non-payment is necessary; and where a duly-authorized agent, or officer of an incorporated' company, draws in behalf of the company upon the treasurer, cashier, or other officer of the company, who has the custody of, and is charged with the duty of disbursing, the company's funds, this is, in substance, it should seem, a draft by the company upon itself, and may be treated either as a bill of exchange or a promissory note; and it may be laid down as a general rule that whenever it was intended as a bill of exchange, or a promissory note, and it possesses the requisites of each, it may be treated as either, at the option of the holder. 1 Pars. Bills & Notes, 163.

But, say appellants, this argument will not apply, because it is admitted this draft is a forgery. The foregoing is an answer to their argument that an acceptance was necessary to bind the company. The fact of Bousfield's employment, and giving drafts for wood, etc., coupled with the fact that Wade, another employe, informed defendants that the wood was furnished, goes far to show the particularity which defendant required before discounting the draft, and its desire to guard against all contingencies; and as we hold no acceptance was necessary, its genuineness must be inquired into on its being discounted by the bank, and such inquiry was made of him whose business was to examine into their genuineness, and to pay the same. What more could be asked of any one discounting this draft?

The further contention is made by appellants that Wade had no authority thus to bind the company. Let us see. The testimony is that Mr. White opened an account in the name of the Western Mining Company, and did the usual course of business of a mine with this bank; drew drafts on San Francisco; checks to pay their debts; until, a month or two after he opened his account, he notified the bank to honor the signature of Joseph H. White, per A. P. Wade. The manager of the bank testifies, in effect, that Mr. Wade took the place of Mr. White. He drew his checks, and paid the

debts of the company. In relation to accounts of the mill, the manager says: "Mr. Wade would usually come down before pay-day, to see if we had any mill drafts, to look at them, and see if they were all right; and if they were all right, he would say: 'I will bring you in a check for this amount.' On several occasions he would come in, and take up the drafts before they came due, and say: 'I might as well pay you that sum now as to wait till pay-day.' Mr. Wade was the only man we ever saw in connection with these mill drafts. He seemed to be thoroughly posted on them, and careful in taking them, and appeared to be in a position to know whether they were good drafts or not." Under the authority given Wade by White, the latter says: "Wade sometimes paid for the mill supplies. * * * Wade paid some of them, and I paid some of them. I paid most all of them when I was here." Here was Mr. Wade paying and examining the mill accounts, in a position to be cognizant of all the indebtedness of the mill, and, according to the testimony of the bank manager, "was in a position to know whether these drafts were good or not. * * * Was in the habit of coming in and examining them, and passing upon their correctness, and if he did not know anything about what the drafts were given for, he would telephone to the mill. He had a telephone communication with the mill, and had ample opportunities of ascertaining their genuineness."

"When the agent acts beyond, or even in direct opposition, to his express authority, but within the scope of his implied authority,—that is, within the apparent authority conferred upon him, or appearing from a prior course of dealing with or on behalf of his principal, or from any other mode of his being held out to the world as appearing to possess the authority,—and the principal is personally innocent of any fraud, the principal cannot acquire and retain any benefit obtained, under such circumstances, from the fraud, representations, or concealments." 2 Pom. Eq. Jur. 399. Wade was not guilty of any designated fraud, but his representations of the genuineness of Bousfield's signature was the injury inflicted upon the bank, and his principal must therefore be answerable. His apparent con-

trol over the business of paying these drafts,—of means of knowledge of their correctness; the sanction of the signature,—would make it a great injustice to set up a more narrow limit to his authority. "The maxim of natural justice here applies with its full force, that he who, without intentional fraud, has enabled any person to do an act which must be injurious to himself, or to another innocent party, shall himself suffer the injury, rather than the innocent party who has placed confidence in him. The maxim is founded in the soundest ethics, and is enforced to a large extent by courts of equity." Field, Corp. 193; Story, Ag. 152.

The judgment and the order denying motion for new trial are affirmed.

Shields, C. J., and Barnes, J., concurred.